**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LOREN MITCHELL
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 31, 2025

Sarah E. Delia, Esquire
McCarter & English, LLP
405 N. King Street, 8th Floor
Wilmington, DE 19801

Brad D. Sorrels, Esquire
Andrew D. Cordo, Esquire
Nora M. Crawford, Esquire
Amanda L. Day, Esquire
Jacqueline G. Conner, Esquire
Wilson Sonsini Goodrich & Rosati P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801

RE:    *Richard Scarantino v. The Trade Desk, Inc.,*
       C.A. No. 2025-0442-LM

Dear Counsel:

Before me is a books and records action in which the plaintiff seeks to inspect

the books and records of The Trade Desk, Inc. for the stated purpose of investigating

suspected misconduct in relation to the company's choice to reincorporate from

Delaware to Nevada and its effect on the company's dual-class capitalization

structure. Herein, I find that plaintiff has established a proper purpose and is entitled

to inspect the formal board materials necessary and essential to investigate

misconduct in the board's decision to reincorporate and its effect on the

capitalization structure. I also find that the plaintiff does not have a right to the

informal board materials or the documents they have identified as being privileged.

## I.    FACTUAL BACKGROUND[1]

This is a books and records action initiated by Richard Scarantino (hereinafter, "Plaintiff" or "Mr. Scarantino") against The Trade Desk, Inc. (hereinafter, "Trade Desk" or "Defendant"). What follows is a brief factual background drawn from the parties' stipulations in the pretrial order, sixty-eight exhibits, and the argument presented at the paper record trial held on July 16, 2025.[2]

### A.    The Parties

Trade Desk is a company that offers a cloud-based service in data-driven advertising campaigns, that was originally a Delaware Corporation but reincorporated in Nevada as of November 2024.[3] Trade Desk was cofounded by Jeff T. Green (hereinafter, "Mr. Green") and David Pickles (hereinafter, "Mr. Pickles") in November 2009 and offered its initial public offering of stock on September 21, 2016.[4] On September 23, 2016, Trade Desk filed an amended and restated certificate

---

[1] Items filed on the docket are cited as "D.I.__" or as defined when they first appear. The Parties submitted exhibits 1– 68 are cited as "JX__." See D.I. 30. I grant the evidence the weight and credibility I find it deserves.

[2] *See* D.I. 29; D.I. 35.

[3] D.I. 29 ("Pretrial Order") at ¶1; *see also* JX 33.

[4] JX 1 at 1; Pretrial Order at ¶¶3–5.

of incorporation (hereinafter, the "Charter").[5] Mr. Green is the primary owner of Class B shares.[6] Mr. Scarantino is a beneficial owner of 52 shares of Trade Desk Class A common stock, which he has continuously held since August 6, 2024.[7]

## B. Trade Desk's Capital Structure

Trade Desk's common stock is divided into two classes: publicly traded Class A common stock and non-publicly traded Class B common stock.[8] Each share of Class A stock entitles its holder to cast one vote, while each share of Class B shares entitles its holder to cast ten votes.[9] The Charter provides a dilution trigger which causes each Class B share to convert into one Class A share upon the date that the number of Class B shares represents less than ten percent of the aggregate number of then outstanding Class A and Class B shares.[10] Leading up to 2020, Trade Desk's capitalization approached this dilution trigger.[11]

## C. Prior Litigation

---

[5] JX 1; Pretrial Order at ¶7.

[6] JX 26 at 46.

[7] Pretrial Order at ¶2; JX 18.

[8] Pretrial Order at ¶4; *see generally* JX 1 at Art. IV §C.

[9] JX 1 at Art. IV §C.1(b); Pretrial Order at ¶4.

[10] JX 1 at Art. V at "Final Conversion Date"; Pretrial Order at ¶8.

[11] *See City Pension Fund for Firefighters & Police Officers v. The Trade Desk, Inc.*, 2022 WL 3009959, at *3 (Del. Ch. July 29, 2022).

On June 3, 2020, the board met and formed a special committee, under the advice of legal counsel, to conduct an *MFW-* structured transaction to delay the dilution trigger in order to maintain the dual class structure.[12] On August 27, 2020 Mr. Green and the committee executed a term sheet outlining the elimination of the dilution trigger and creating a date for the automatic conversion of Class B shares to Class A shares on a 1:1 basis upon the occurrence of certain events, including reaching December 22, 2025.[13] Trade desk filed a proxy statement on October 27, 2020 with the SEC soliciting stockholder approval of the amendment to the Charter eliminating the dilution and inserting the conversion date of December 22, 2025, and scheduled the vote to occur at a meeting on December 7, 2020, which was adjourned to December 22, 2020.[14] A majority of unaffiliated stockholders voted at the December 2020 meeting to approve the amendment to eliminate the dilution trigger and provide for the conversion date.[15] This 2020 amendment to the Charter that, among other things, eliminated the dilution trigger and provided for the Final Conversion was, in part, the subject of the litigation, *City Pension Fund for*

---

[12] Pretrial Order at ¶9; *City Pension Fund for Firefighters & Police Officers v. The Trade Desk, Inc.*, 2022 WL 3009959, at *4–5 (Del. Ch. July 29, 2022).

[13] Pretrial Order at ¶10.

[14] JX 3; Pretrial Order at ¶11.

[15] Pretrial Order at ¶12.

*Firefighters & Police Officers v. The Trade Desk, Inc.*, which was decided on July 29, 2022, when the Court granted Trade Desk's motion to dismiss.[16]

There are two other cases involving Trade Desk in recent years. One, *In re The Trade Desk, Inc. Derivative Litigation*, which this Court dismissed on February 14, 2025, for failing to plead with particularity facts for which the court could infer demand futility, which is now being considered on appeal by the Supreme Court of the State of Delaware.[17] The other, *Gunderson v. The Trade Desk, Inc.*, which the Court found therein that a supermajority was not necessary for the approval of reincorporation, ruling partially favor of Trade Desk for counts I and II of the action, and the rest of the case is still ongoing.[18]

### D.    The Reincorporation

The board of Trade Desk began holding meetings in April 2024 discussing the reincorporation of the company to Nevada.[19] The meeting minutes from the meetings held on April 23, 2024 and July 22, 2024, indicate that the board was considering reincorporation due to recent Delaware developments and in

---

[16] *City Pension Fund for Firefighters & Police Officers v. The Trade Desk, Inc.*, 2022 WL 3009959, at *23 (Del. Ch. July 29, 2022); JX 5; Pretrial Order at ¶13.

[17] *In re Trade Desk, Inc. Derivative Litig.*, 2025 WL 503015, (Del. Ch. Feb. 14, 2025).

[18] *Gunderson v. Trade Desk, Inc.*, 326 A.3d 1264, (Del. Ch. 2024).

[19] JX 13; Pretrial Order at ¶14.

consideration of a deck provided to board members.[20] The Trade Desk's Nominating and Corporate Governance Committee also met on July 22, 2024 where they discussed reincorporation after a presentation from legal counsel.[21]

Three special meetings were held discussing the reincorporation.[22] On September 20, 2024, the board held another special meeting at which it approved resolutions concerning the reincorporation of Trade Desk to Nevada.[23] Trade Desk filed a Proxy statement on October 3, 2024, contemplating a special meeting with stockholders on November 14, 2024 to vote on reincorporation.[24] The meeting and vote was held as scheduled on November 14, 2024, and the conversion to a Nevada corporation became effective on November 15, 2024, after the vote went in favor of the reincorporation.[25]

---

[20] JX 13; JX 15 at 4.

[21] Pretrial Order at ¶16; JX 16 at 2; *see also* JX 17 and 20 (including the materials from this meeting).

[22] Pretrial Order at ¶¶17–19; JX 19; JX 21; JX 23; *see also* JX 22 (including the materials from the meeting that took place on August 27, 2024).

[23] *See* JX 24 at 2; Pretrial Order at ¶20.

[24] JX 26 at 2.

[25] Pretrial Order at ¶¶23–25; JX 33 at 2.

### E.     The Demands

On October 21, 2024, Plaintiff served Trade Desk with a demand to inspect books and records under Section 220 (hereinafter, the "Demand").[26] The Demand was filed in response to the proposed reincorporation of Trade Desk.[27] Trade Desk responded to the Demand on October 28, 2024, disputing Plaintiff's right to inspect the documents he requested in his demand.[28]

On December 19, 2024, Trade Desk produced certain documents in response to the Demand, including D&O questionnaires, minutes, and materials for both special and regular board meetings, minutes, and materials for the Nominating and Corporate Governance Committee meetings, as well as certain materials prepared by a professor from the University of California, Berkeley School of Law who the board retained to be consult with the board on the reincorporation.[29]

Plaintiff's counsel sent an email restating the Demand on January 8, 2025 and specifically requesting, the deck shared with the board; a copy of the professor's engagement letter; and board or committee materials or other records involving the

---

[26] JX 28; Pretrial Order at ¶26.

[27] JX 28 at 4–6.

[28] JX 30; Pretrial Order at ¶27.

[29] Pretrial Order at ¶28; JX 2; JX 20; JX 22; JX 25; JX 27.

sunset of any dual class capitalization.[30] Trade Desk made another production on February 5, 2025 that included minutes from the October 22, 2024, meeting of the board, the professors professional service agreement, and a privilege log, and then certified that the production was complete regarding every category they agreed to produce.[31]

After Trade Desk had produced 19 documents and 521 pages in response to the Demand, Plaintiff remained unsatisfied with the production and on March 17, 2025 sent a third letter reiterating his demand for documents.[32] In the March 17, 2025 letter, Plaintiff states that production was insufficient to investigate the wrongdoing in connection with the reincorporation and making the same argument that he continues to suspect that the reincorporation is a tool being used to perpetuate Mr. Green's control.[33] On April 1, 2025, Trade Desk responded to Plaintiff, citing the already robust production in response to the first two demands and claiming that they believe they have more than complied with what is required of them under

---

[30] JX 36.

[31] Pretrial Order at ¶30; JX 29; JX 27; JX 40; JX 39 at 1 ("[W]e certify that, to the best of our knowledge and following a reasonable investigation, the Company's production is complete[.]").

[32] JX 42. The documents produced by the Defendant up to this point are represented as JX 6–13, 15–17, 19–24, 27, and 29. Pretrial Order at ¶31.

[33] JX 42.

Section 220 and restating their certification in the February 5, 2025 letter that production was complete.[34] The final letter from Trade Desk also addresses the Plaintiffs claims asserting that the provided information regarding the board's decision to reincorporate and the change in capital structure are proper, sufficient to fulfill the Plaintiff's demand, and unremarkable in the light of the changes happening in the Delaware corporate market.[35]

After the filing of Plaintiff's complaint and on the eve of trial, on July 14, 2025, Trade Desk filed a preliminary proxy to the SEC, which was submitted as an additional exhibit.[36] The preliminary proxy contemplates, in relevant part, a vote occurring at a special meeting to approve amendments to the Articles of Incorporation that would change the date that the Class B stock will convert to Class A common stock.[37]

### F.    Procedural Posture

The Plaintiff filed the complaint seeking to compel the inspection of the books and records of Trade Desk on April 24, 2025.[38] Trade Desk answered the complaint

---

[34] JX 43.

[35] *Id.* at 1– 2.

[36] D.I. 35; JX 68.

[37] JX 68 at 24.

[38] D.I. 1.

on May 9, 2025, denying the Plaintiffs right to the relief he is seeking and arguing

failure to comply with the requirements of 8 Del. C. § 220, failure to set forth a

credible basis, lack of proper purpose, and that Plaintiff's request is overbroad and

contains requests for privileged information.[39] The parties completed their pretrial

briefing consisting of an opening brief, an answering brief, and a reply on July 9,

2025.[40] A trial took place on July 16, 2025, thereafter I took this matter under

advisement.[41]

## II.     ANALYSIS

"To inspect books and records under Section 220, a plaintiff must establish

by a preponderance of the evidence that the plaintiff is a stockholder, has complied

with the statutory form and manner requirements for making a demand and has a

proper purpose for conducting the inspection."[42] "After meeting these requirements

the plaintiff must demonstrate by a preponderance of the evidence that 'each

---

[39] D.I. 9 at 37–39.

[40] D.I. 16; D.I. 19; D.I. 32.

[41] D.I. 36.

[42] *Pettry v. Gilead Sciences, Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020).

category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection.'"[43]

The parties here do not dispute Mr. Scarantino's stockholder status as a beneficial owner of 52 shares of Class A common stock, which he has continuously held since August 6, 2024.[44] The parties dispute the existence of a proper purpose, the scope of production pursuant to that purpose, and Plaintiff's right of access to certain requested documents that are subject to attorney-client privilege. I address each issue in turn below.

### A. The Plaintiff has a credible basis to inspect the books and records of Trade Desk to investigate potential wrongdoing.

"The 'propriety of the stockholder's purpose' is the 'paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records.'"[45] A proper purpose is defined as "a purpose reasonably related to such person's interest as a stockholder."[46] Delaware law considers the desire to

---

[43] *Lebanon Cnty. Employees.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *6 (Del. Ch. Jan. 13, 2020) (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)), aff'd, 243 A.3d 417 (Del. 2020).

[44] Pretrial Stipulation at ¶2; JX 18; *see also* JX 54– 62 (documenting Mr. Scarantino's brokerage account statements).

[45] *Simeone v. Walt Disney Co.*, 302 A.3d 956, 966 (Del. Ch. 2023) (quoting *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982)).

[46] 8 Del. C. § 220(b).

investigate mismanagement to be a proper purpose.[47] Notably though, an allegation

of misconduct alone "without more will not entitle a stockholder to inspection."[48]

"[A] stockholder seeking to investigate wrongdoing must show, by a preponderance

of the evidence, a credible basis from which the court can infer there is 'possible

mismanagement as would warrant further investigation."[49]

"The credible basis standard is 'the lowest possible burden of proof[,]'"[50] and

it does not require a plaintiff "prove that wrongdoing 'actually occurred.'"[51] "A

stockholder need not show that corporate wrongdoing or mismanagement has

occurred in fact, but rather the 'threshold may be satisfied by a credible showing,

through documents, logic, testimony or otherwise, that there is a legitimate issue of

wrongdoing.'"[52]

---

[47] *Gill v. Regency Hldgs., LLC*, 2023 WL 4607070, at *13 (Del. Ch. June 26, 2023).

[48] *Pettry v. Gilead Sciences, Inc.*, 2020 WL 6870461, at *10 (Del. Ch. Nov. 24, 2020).

[49] *AmerisourceBergen Corp. v. Lebanon Cnty. Employees' Ret. Fund*, 243 A.3d 417, 426 (Del. 2020) (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).

[50] *Regency Hldgs., LLC*, 2023 WL at *13; (quoting *Seinfeld v. Verizon Communications, Inc.*, 909 A.2d 117, 123 (Del. 2006)).

[51] *Id.* (quoting *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Jan. 13, 2020).

[52] *AmerisourceBergen Corp.*, 243 A.3d at 426 (quoting *Verizon*, 909 A.2d at 123).

Defendant argues that *TripAdvisor* has been used by Plaintiff to imply that "reincorporation presumptively established a credible basis for wrongdoing."[53] Without mischaracterizing what the Plaintiff may or may not argue in his briefing, I find this to be a minimization on Tripadvisor's application to this case. This Court is tasked at the books and records stage to determine whether the Plaintiff has "a credible basis from which this Court may *infer* possible mismanagement, waste, or wrongdoing may have occurred."[54] The footnote Plaintiff cites to in *Tripadvisor* explains that the Supreme Court of Delaware applied the business judgment rule because there "the record [] suggest[ed] the existence of a clear day and the absence of any material, non-ratable benefits flowing to the controller or directors as a result of the Conversions" but indicates that this conclusion may have been different had the Defendants "taken any articulable, material steps in connection with any post-conversion transaction" in furtherance of breaching their fiduciary duties.[55]

Here, considering Trade Desk's prior decisions to delay the dilution trigger, the most recent proxy proposing the removal of the sunset provision filed soon after their reincorporation to Nevada, and the benefit flowing to Mr. Green as primary

---

[53] D.I. 19 at 19; *Maffei v. Palkon*, 2025 WL 384054, (Del. Feb. 4, 2025) (referred to above the line as "*Tripadvisor*").

[54] *Verizon*, 909 A.2d at 122 (emphasis added).

[55] *Palkon*, 2025 WL at *28 n. 249.

owner of Class B stock, it is reasonable to have concern that the decision to reincorporate was not made on a clear day.[56] The evidence does not need to ultimately be enough to succeed in the underlying claim, it only need be sufficient to meet the credible basis standard, and here I find it does.[57]

I find *TripAdvisor*, for the purpose of credible basis analysis pursuant to a books and records action, informs this Court to find the evidence presented suggests a "legitimate issue of wrongdoing."[58] Plaintiff has therefore successfully established a proper purpose to investigate wrongdoing in connection with the reincorporation.

**B.** **The formal board materials relating to the capitalization structure and Mr. Green's ownership of Class B stock are essential to Plaintiff's purpose however plaintiff is not entitled to the production informal board materials.**

After establishing a proper purpose for inspection, plaintiffs are then tasked with showing "by a preponderance of the evidence that the books and records . . .

---

[56] Pretrial Order at ¶11; JX 3; JX 26 at 42; JX 68.

[57] "This standard does not require stockholders to show actual waste or mismanagement" and the evidence is considered collectively, meeting this standard even if it "may likely fall far short of that necessary to support an actual claim." *NVIDIA Corp. v. City of Westland Police and Fire Retirement System*, 282 A.3d 1, 26 (Del. 2022) ("While this evidence likely would fall far short of that necessary to support an actual claim, we cannot say that it is insufficient to meet the lowest possible burden of proof– a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation.").

[58] *AmerisourceBergen Corp.*, 243 A.3d at 426 (quoting *Verizon*, 909 A.2d at 123).

demanded are essential to [their] purpose."[59] "[E]ven if a stockholder's purpose is proper, Section 220 'does not open the door to the wide ranging discovery that would be available in support of litigation,' because 'the stockholder's inspection right is a qualified one.'"[60] "The production of records in response to a Section 220 demand is not the equivalent of discovery in a plenary action."[61] "[W]here a section 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and /or stockholders."[62]

> **1.  Plaintiff's request for all materials relating to the dual class structure and Mr. Green's ownership of Class B shares are necessary and essential to Plaintiff's stated purpose.**

Plaintiff argues that formal board materials relating to Mr. Green's Class B ownership and the sunsetting of the Trade Desk's dual-class structure are necessary and essential to investigate the board's suspected breaches of fiduciary duty relating

---

[59] *Gross v. Biogen Inc.*, 2021 WL 1399282, at *13 (Del. Ch. Apr. 14, 2021).

[60] *In re Lululemon Athletica Inc. 220 Litig.*, 2015 WL 1957196, at *5 (Del. Ch. Apr. 30, 2015) (quoting *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114 (Del. 2002)) (quoting *United Techs. Corp. v. Treppel*, 109 A.3d 553, 559 (Del. 2014)).

[61] *Woods Trustee of Avery L. Woods Tr. v. Sahara Enterprises, Inc.*, 238 A.3d 879, 896 (Del. Ch. 2020).

[62] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002).

to the reincorporation and its effect on the capitalization structure.[63] I agree. The Plaintiff's proper purpose is to investigate *wrongdoing* in relation to the decision to reincorporate, not to investigate the reincorporation alone. So, it follows that the materials which are necessary and essential to fulfill the Plaintiff's proper purpose of investigating proper wrongdoing would extend to those subjects which would be informative to the misconduct suspected.[64] The wrongdoing suspected here is Mr. Green being siphoned a benefit through the change in capitalization that was potentially put into motion through the decision to reincorporate. Thus, the production does not stop at material relating to the reincorporation alone but to the misconduct of the board in relation to that decision.

I therefore must find that the Plaintiff's request for board level materials in relation to the board's consideration of Mr. Green's Class B ownership and relating to the sunsetting of the dual class capitalization to be necessary and essential to the investigation into any wrongdoing in relation to the board's decision to reincorporate.

---

[63] D.I. 16 at 36–37.

[64] *See Bucks County Employees Ret. Fund v. CBS Corp.*, 2019 WL 6311106, at *9 (Del. Ch. Nov. 25, 2019) (finding that board level documents relating to "Plaintiff's supported theory of wrongdoing" were "necessary and essential to allow a proper investigation of this alleged wrongdoing.").

**2.     The Plaintiff has failed to bring adequate evidence that would justify the production of communications beyond formal board materials.**

"The starting point (and often the ending point) for an adequate inspection will be board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered[.]"[65] Broader inspection rights may be granted but only if plaintiff is able to "introduce[] evidence indicating that atypical circumstances necessitat[e] a broader inspection[.]"[66] Examples of such circumstances are instances when the company "did not 'honor traditional corporate formalities' or that 'traditional material, such as board resolutions or minutes' are wanting[;]" another example is an instance where "the plaintiff cited 'evidence of wide-ranging mismanagement[.]'"[67]

"[T]he Court of Chancery should not order emails to be produced when other materials (e.g. traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose."[68] It is only in circumstances where the provided

---

[65] *Sahara Enterprises, Inc.*, 238 A.3d at 897.

[66] *Oklahoma Firefighters Pension and Retirement System v. Amazon.com, Inc.*, 2022 WL 1760618, at *12 (Del. Ch. June 1, 2022).

[67] *Id.* (citing *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 742 (Del. Ch. 2019)) (quoting *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at *5 (Del. Ch. Jan. 9, 2003)).

[68] *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752–53 (Del. Ch. 2019).

materials are insufficient where the Court will order emails be produced, otherwise it is not appropriate at the books and records stage for the Court to order its production.[69]

Plaintiff argues in his final demand letter that the proxy and minutes provide insufficient detail to the reasoning the board elected to move forward with reincorporation when they describe the reasoning for reincorporation being due to the unpredictability of decision making in the face of recent Delaware Court of Chancery decisions specifically in relation to litigation involving controlling stockholders.[70] Plaintiff disagrees here with the board's conclusions and fears developed in response to the climate of recent decisions, but this is not a justifiable reason to order the inspection of informal board materials when the formal board materials have provided the information necessary to investigate the board deciding to reincorporate and whether their intentions were nefarious.[71]

---

[69] *See id.* at 752 (Del. Ch. 2019); *see also Bucks County Employees Retirement Fund*, 2019 WL at *9 ("Plaintiff is not, however, entitled to the electronic communications sought in this request, at least not in this Section 220 production. The CBS Board-level compensation documents are sufficient to enable Plaintiff's investigative purpose.").

[70] JX 42; *see* JX 26 at 15 ("The increasingly litigious environment facing corporations with controlling stockholders has created unpredictability in decision-making and has started to impede our ability to act quickly.").

[71] *See e.g. Walt Disney Co.*, 302 A.3d at 973–74 (holding that the plaintiff did not have the right to inspect three years of emails relating to a particular topic when "[t]he Board maintained formal records of its actions, and the relevant records were provided to the plaintiff"); *see also Biogen Inc.*, 2021 WL at *15 (holding that plaintiff did not have a right

Formal board level documents sufficient "to effectively address the problem" have been provided to the Plaintiff and no further evidence has been presented to justify the Court to order the production of informal board materials.[72] Thus, no further production is necessary at this books and records stage because formal board level documents satisfy those necessary and essential to the Plaintiff's stated purpose and no evidence was presented by the Plaintiff that support the necessity for a broader inspection.

### C. The Plaintiff fails to show that Trade Desk is obligated to produce the privileged presentations requested.

Delaware Rule of Evidence 502(b) governs attorney-client privilege, and provides that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between the client or the client's representative and the client's lawyer or the lawyer's representative[.]"[73] "The burden of establishing privilege is on the party asserting

---

[72] to inspect electronic communications because they "presented no evidence or argument that the requested informal board materials are necessary or, conversely, that the formal board materials would be insufficient for him to investigate the alleged wrongdoing.").

[72] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002).

[73] D.R.E. 502(b).

that privilege."[74] Once privilege is established "[t]he party seeking to invoke an exception to the attorney-client privilege bears the burden of showing that it applies."[75]

Plaintiff claims that Trade Desk has wrongfully withheld two presentations one from July 19, 2024, and one from August 10, 2024.[76] Trade Desk argues that these documents are protected under attorney-client privilege and work product doctrine.[77] Plaintiff does not dispute that these documents are privileged, but instead argues that these presentations are able to be inspected pursuant to waiver, through the Garner doctrine, and under exceptions to the work-product doctrine.[78] For reasons explained below, I do not find that Trade Desk has waived privilege and further I do not find it appropriate to force the production of these privileged documents.

### 1.     Trade Desk has not waived privilege.

"[A]ttorney-client privilege 'protects the communications between a client and an attorney acting in his professional capacity where the communications are

---

[74] *In re Fuqua Indus., Inc., 2002 WL 991666*, at *1 (Del. Ch. May 1, 2002).

[75] *J.P. Morgan Tr. Co. of Delaware v. Fisher*, 2019 WL 6605863, at *6 (Del. Ch. Dec. 5, 2019).

[76] D.I. 16 at 40; *see* JX 42 at 5.

[77] D.I. 19 at 34–42.

[78] D.I. 16 at 40–45.

intended to be confidential, and the confidentiality is not waived.'"[79] The Delaware Rules of Evidence assert that "privilege conferred by [its] rules or work- product protection" will be considered waived "if such a person … while holder of the privilege or while entitled to work-product protection intentionally discloses or consents to disclosure of any significant part of the privileged or protected communication or information."[80] An exception to this rule is in circumstances where "the disclosure itself is privileged or protected."[81] "Members of a board are charged with 'the proper management of the corporation' and 'treated as the joint client when legal advice is rendered to the corporation through one of its officers or directors.'"[82]

Plaintiff appears to argue that Trade Desk waived the ability to assert privilege regarding the August 10, 2024, presentation because it was created by Wilson Sonsini Goodrich & Rosati (hereinafter, "WSGR"), and they represented Plaintiff

---

[79] *DLO Enterprises, Inc. v. Innovative Chemical Prods. Gp.*, 2020 WL 2844497, at *3 (Del. Ch. June 1, 2020) (quoting *Moyer v. Moyer*, 602 A.2d 68,72 (Del. 1992)).

[80] D.R.E 510(a).

[81] *Id.*

[82] *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 5226487, at *3 (Del. Ch. Nov. 9, 2021) (quoting *Moore Business Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *4 (Del. Ch. June4, 1996)).

individually in *City Pension Fund*.[83] WSGR represented the company in connection with the reincorporation and privilege protects communications between a client and their attorney acting in a professional capacity;[84] the August presentation was given to Mr. Green as a board member, a joint client of the company, and therefore was not a disclosure constituting waiver, but a communication protected under privilege.[85]

The Plaintiff fails to provide evidence that Trade Desk engaged in any conduct that would have constituted a waiver of privilege. I therefore find that the Plaintiff does not have a right to access these documents pursuant to their argument of waiver.

### 2. The Plaintiff is not entitled to the privileged documents under the *Garner* exception.

The concept of privilege "is so fundamental to the administration of justice that the privilege is, effectively, absolute[,]" however the *Garner* doctrine offers "an exception to . . . absolute privilege . . . 'in order to prove fiduciary breaches by those

---

[83] D.I. 16 at 40–41; *see generally City Pension Fund for Firefighters & Police Officers v. The Trade Desk, Inc.*, 2022 WL 3009959, (Del. Ch. July 29, 2022).

[84] D.I. 19 at 35; D.I. 16 at 43 ("the board apparently retained WSGR"); D.R.E. 502(b).

[85] *Ford Smart Mobility LLC*, 2021 WL at *3 (quoting *Moore Business Forms, Inc.*, 1996 WL at *4).

in control of the corporation upon showing good cause.'"[86] In determining whether

the *Garner* exception applies, this Court will consider the following non-exhaustive

list of factors:

> [1] the number of shareholders and the percentage of stock they represent; [2] the bona fides of the shareholders; [3] the nature of the shareholders' claim and whether it is obviously colorable; [4] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6] whether the communication related to past or to prospective actions; [7] whether the communication is of advice concerning the litigation itself; [8] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [9] the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.[87]

"[T]he *Garner* exception [is] 'narrow, exacting, and intended to be very

difficult to satisfy."[88] Although *Garner* contains the extensive factors described

above to assess whether the stockholder has established "good cause," the Court will

narrow this analysis to an "inquiry [of] three factors: '(i) whether the claim is

---

[86] *In re Oracle Corp. Derivative Litig.*, 2019 WL 6522297, at *19 (Del. Ch. Dec. 4, 2019) (quoting *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1276 (Del. 2014)).

[87] *Buttonwood Tree Value Ptrs., L.P. v. R.L. Polk & Co.*, Inc., 2018 WL 346036, at *2–3 (Del. Ch. Jan. 10, 2018) (quoting *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir. 1970)).

[88] *Employees' Ret. Sys. of Rhode Island v. Facebook, Inc.*, 2021 WL 529439, at *8 (Del. Ch. Feb. 10, 2021) (quoting *Wal-Mart Stores, Inc.*, 95 A.3d at 1278).

colorable, (ii) the necessity or desirability of information and its availability from other sources and (iii) the extent to which the information sought is identified as opposed to a blind fishing expedition.'"[89] The most important of the factors being identified as "whether the privileged information sought 'is both necessary to prosecute the action and unavailable from other sources[.]'"[90]

I will start by granting Plaintiff the first and third considerations, in that he seems to only request a narrow production of two identified presentations and as already discussed in my prior analysis, Plaintiff's claim is colorable as he has established credible basis.[91] Plaintiff however fails on the middle and most important prong requiring a showing of necessity. Despite finding above that the requested materials relating to the sunset provision, the change in capitalization structure, and Mr. Green's Class B share ownership was necessary and essential to Plaintiff's proper purpose, I do not find the production of these privileged presentations to be necessary because I have already ordered further production. This Court, in *Facebook*, determined that this prong was not satisfied, because it had already

---

[89] *Id.* at *9 (Del. Ch. Feb. 10, 2021) (quoting *In re Oracle Corp.*, 2019 WL at *18).

[90] *Id.* (quoting Buttonwood, 2018 WL at *5 n. 24) (noting that the dispositive nature of this prong is especially applicable to books and records actions given that the Court has already considered the necessary and essential prong required under a Section 220 action).

[91] D.I. 19 at 40; *see In re Lululemon*, 2015 WL at *11 (finding a colorable claim existed based on the same analysis which found a credible basis pursuant to a section 220 analysis).

ordered further non- privileged electronic communications, and it determined that this further production contained the information necessary to satisfy the 220 standard "without exposing the advice of counsel."[92] For identical reasons, I find here that Plaintiff has been granted access to non-privileged board level materials related to the issue of the change in capitalization structure under the sunset provision and the board's consideration of Mr. Green's Class B ownership in relation to the reincorporation and this meets the necessary and essential standard under Section 220 such that further production of privileged documents is unnecessary.

Plaintiff has failed to make a showing under the Garner doctrine that he has a right to these privileged documents. For similar reasons, Plaintiff is also not entitled to the privileged documents pursuant to exceptions attaching to documents protected by the work-product doctrine.[93] The presentations therefore remain protected at this stage of litigation pursuant to privilege and under the work-product doctrine.

---

[92] *Facebook, Inc.*, 2021 WL at *10 ("Because Section 220 inspections must give the stockholder what is essential, but stop as what is sufficient, and Plaintiff will receive further non-privileged documents responsive to its Demand, I am satisfied Plaintiff has not carries its heavy burden to justify a court order compelling the production of documents protected by the attorney-client privilege.").

[93] The *Garner* doctrine is not extended to items protected as work product, however, because of their "overlap with the required showing under Rule 26(b)(3)" exceptions, the result of each analysis is often the same. *Buttonwood*, 2018 WL at *6 n. 28 (citing *Wal-Mart Stores, Inc.*, 95 A.3d at 1280–81) ("For the same reasons that *Garner* does not apply to the privileged documents, I will not order production of documents withheld on the basis of the work-product doctrine.").

### D. Plaintiff is not entitled to bad faith fee shifting.

In Delaware, courts generally follow the American rule that parties are "expected to pay their own attorneys' fees."[94] A court may shift fees under limited circumstances "for bad faith conduct 'to deter abusive litigation and to protect the integrity of the judicial process.'"[95] This Court does not invoke the bad faith exception lightly.[96] The party seeking bad faith fee shifting must satisfy "the stringent evidentiary burden of producing 'clear evidence' of bad faith."[97]

Plaintiff argues that Trade Desk engaged in "overly aggressive litigation strategy" by refusing to abide by their inspection demands for reasons they claim to be "glaringly egregious."[98] The bad faith litigation strategy that the Plaintiff is referring to is the Defendant raising arguments of conspiracy alleging Plaintiff engaged in dealings between his counsel and the attorneys representing other

---

[94] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citing *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).

[95] *Tigani v. Tigani*, 2021 WL 1197576, at *25 (Del. Ch. Mar. 30, 2021) (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)).

[96] *Ravenswood Inv. Co. v. Winmill & Co.*, 2014 WL 2445776, at *4 (Del. Ch. May 30, 2014) ("The bad faith exception is not lightly invoked.").

[97] *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)).

[98] D.I. 16 at 46 (quoting *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del.Ch., 2023) and *PVH Polymath Venture Holdings Ltd. v. TAG Fintech, Inc.*, 2024 WL 371084, at *1–2 (Del. Ch. Jan. 31, 2024)).

stockholders, however Defendant brought up no such arguments in his briefing.[99] The Plaintiff states in his reply that it "maintains that fee shifting may yet prove appropriate" but acknowledges that the Defendant did not assert in its briefing the defense it asserted would have justified bad faith fee shifting.[100] Plaintiff makes another, more generalized, argument that Defendant refusal to produce documents and "mischaracterization of Plaintiff's purpose" is clear evidence of bad faith.[101]

Neither of these arguments are sufficient to justify bad faith fee shifting. Plaintiff has failed to meet the standard to "produce[] clear evidence of bad faith," and therefore I do not find bad faith fee shifting appropriate on these bases.[102]

## III. CONCLUSION

The Plaintiff has established a proper purpose to investigate misconduct relating to the reincorporation of the company to Nevada and the board's consideration of the sunset provision and any benefit it may confer to Mr. Green as a Class B share owner. Plaintiff is entitled to the formal board materials relating to its proper purpose including those materials relating to the dual class capitalization

---

[99] D.I. 16 at 45–46; D.I. 19 at 43.

[100] D.I. 32 at 25 n. 94.

[101] D.I. 16 at 46.

[102] *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)).

structure, the sunset provision, and Mr. Green's Class B shares. Plaintiff has no right to inspect email communications between board members or the two privileged presentations.

This is my final report, and exceptions may be filed in accordance with the expedited schedule under Court of Chancery Rule 144(d)(2).[103]

Respectfully submitted,

*/s/ Loren Mitchell*

Magistrate in Chancery

---

[103] *See* Ct. Ch. R. 144(d)(2) ("A party taking exceptions must file notice of such exceptions within three days of the date of the Final Report[.]").